IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CT-03342-M-RJ

| | | |
|---|---|---|
| DAVID MARSHALL VIVERETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DEPUTY SHERIFF BRANDON | ) | |
| STRICKLAND, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' pending motion for summary judgment. Mot. [D.E. 36]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On September 9, 2022, David Marshall Viverette ("plaintiff"), a federal inmate proceeding *pro se* and without prepayment of fees, filed an unverified complaint under 42 U.S.C. § 1983. [D.E. 1, 2, 9]. Plaintiff generally alleges his September 18, 2019, traffic stop, seizure, search, and arrest by Franklin County Sheriff Duane Barrett II ("Barrett"), and Deputy Brandon Strickland ("Strickland") (collectively, "defendants"), violated his civil rights. See Compl. [D.E. 1] at 1–2.

On March 30, 2023, the court conducted its initial review, allowed the Fourth Amendment claims to proceed, but dismissed the Fifth and Fourteenth Amendment claims. Order [D.E. 10].

On May 25, 2023, defendants answered the complaint. Answer [D.E. 19].

On August 2, 2023, defendants moved to deem admitted their Requests for Admission ("RAF"), Mot. [D.E. 25], and the court granted the motion on October 26, 2023, Order [D.E. 35].

On January 18, 2024, defendants moved for summary judgment, Mot. [D.E. 36], and filed a supporting brief [D.E. 37], a statement of facts [D.E. 38], and an appendix [D.E. 39]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about this motion, the consequences of failing to respond, and the response deadline. [D.E. 40].

On February 9, 2024, plaintiff filed an out-of-time motion for an extension of time to complete discovery, Mot. [D.E. 41], and a motion to appoint counsel, Mot. [D.E. 42].

On April 18, 2024, the court denied plaintiff's motions to appoint counsel and to extend time to complete discovery but allowed him an extension of time to respond to defendants' motion for summary judgment. Plaintiff, however, failed to respond and the time to do so has passed.

<u>Statement of Facts</u>:

Defendants' undisputed statement of facts is deemed admitted for the purposes of the instant motion. <u>See</u> Fed. R. Civ. P. 56(e)(2); E.D.N.C. Local Civ. R. 56.1(a)(2); <u>Felton v. Moneysworth Linen Serv., Inc.</u>, 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); <u>see also</u> <u>Howard v. Coll. of the Albemarle</u>, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), <u>aff'd</u>, 697 F. App'x 257 (4th Cir 2017) (per curiam) (unpublished); <u>United States v. Compassionate Home Care Servs., Inc.</u>, No. 7:14-CV-113-D, 2017 WL 1030706, at *1 n.1 (E.D.N.C. May 15, 2017) (unpublished). Defendants' statement cites the underlying evidence, and the court has reviewed that evidence.

On September 18, 2018, defendants both were serving as Franklin County Deputy Sheriffs, both at the rank of Corporal, and riding together in Strickland's marked patrol car while in uniform, patrolling Franklin County roads. <u>See</u> Defs.' Stmt. Mat. Facts [D.E. 38] at ¶¶1–2.

Shortly before noon, on southbound Bickett Boulevard in Louisburg, defendants observed a white four-door 2005 Chevrolet Malibu "driving erratically and committing numerous moving

violations." Id. at ¶¶3–4. Plaintiff was driving the vehicle, and his passenger was James Chadwick Bartholomew ("Mr. Bartholomew"). Id. at ¶5. Plaintiff and Mr. Bartholomew were driving through Louisburg after Mr. Bartholomew had purchased 50 bags/bindles of heroin that day in Henderson. Id. As they drove, Mr. Bartholomew "ingested 3 bindles of heroin." Id.

At 11:52 a.m., Strickland activated his blue lights and siren and initiated a traffic stop, and plaintiff stopped the vehicle at "the Hasty Mart BP station located at 317 Bickett Boulevard." Id. at ¶¶6–7. Strickland "ran the license plate" and "determined that the Chevrolet Malibu was registered to an elderly woman residing in Rocky Mount, North Carolina," but defendants "observed that the vehicle was occupied by two young white males." Id. at ¶9. Defendants exited the patrol car; Strickland approached the driver's door and Barrett approached the passenger side. Id. at ¶10. Strickland explained he stopped plaintiff due to traffic violations. Id. at ¶11.

While conversing, Strickland: saw plaintiff "had fresh 'track marks' in the crease/crook of his arm"; noted there were "small pieces of cotton strewn on the driver's side floorboard"; and observed plaintiff was "extremely nervous," "spoke in a very excited, spontaneous, and disjointed manner," and "repeatedly insisted" that Strickland knew "Plaintiff and his passenger were returning home after visiting a rim/tire shop located in Henderson, North Carolina." Id. at ¶¶12–14. Based on his training and experience, Strickland knew these "track marks" on plaintiff's arm "were indicative of intravenous drug use," that drug users often use cotton pieces "to filter heroin before injecting it," and that Henderson was a popular location for heroin trafficking. Id.

"Having determined from the license plate check that the [Chevrolet] Malibu was not registered to Plaintiff," Strickland "asked Plaintiff if he intended to buy tires and rims for a vehicle that he did not own," and observed plaintiff "was surprised by this statement." Id. at ¶15.

3

Plaintiff, however, "continued to maintain his story." Id. "During the entire conversation, Plaintiff's voice was very shaky, as was that of his passenger," Mr. Bartholomew. Id.

Meanwhile, Barrett spoke with Mr. Bartholomew who was "acting in a very nervous manner" and "had fresh wounds on his arms that were consistent with intravenous drug use." Id. at ¶16. Inside the vehicle, Barrett "observed a small rubber band that had been placed around the vehicle's gearshift lever." Id. at ¶17. Based upon his training and experience, Barrett "knew that rubber bands of this kind were commonly used to package dosages of heroin into small plastic baggies, sometimes referred to as 'bindles,'" and concluded that Mr. Bartholomew "was acting in a manner consistent with someone who was under the influence of narcotics." Id. at ¶¶16–17.

Plaintiff and Mr. Bartholomew provided their driver's licenses and, upon processing their names and license numbers in his patrol vehicle computer, Strickland found both men had prior arrests for possession of, with intent to distribute, Schedule I controlled substances. Id. at ¶18.

Strickland then returned to the rear of the Chevrolet Malibu and spoke briefly with Barrett. Id. at ¶19. Strickland advised Barrett that plaintiff and Mr. Bartholomew both had prior arrests related to heroin. Id. Barrett advised Strickland "that Mr. Bartholomew was acting strangely and consistent with being under the influence of narcotics." Id. Strickland then informed Barrett about plaintiff's "suspicious cover story about why [the men] had gone to Henderson." Id. Barrett also knew Henderson "was a well-known location for heroin trafficking." Id.

"Mr. Bartholomew suddenly opened the passenger door . . . got out of the car, and walked quickly toward a nearby trash can, seemingly determined to throw something away." Id. at ¶20. These "strange and suspicious" actions suggested to defendants "that Mr. Bartholomew was trying to get rid of something or otherwise hide something from" them. Id. "Strickland quickly caught

up with Mr. Bartholomew to ensure that Mr. Bartholomew was not able to discard something into the trash can or do anything without being observed." Id. "Mr. Bartholomew ultimately returned the Chevrolet Malibu and sat back down in the front passenger seat." Id.

"Based upon the totality of the circumstances" – including Strickland's observations of "track marks on Plaintiff's arm consistent with intravenous drug use" and "pieces of cotton, commonly associated with heroin inside the vehicle," the statements that plaintiff and Mr. Bartholomew were returning from Henderson, "a location well-known for heroin trafficking," the odd behavior of plaintiff and Mr. Bartholomew, and the prior arrests of plaintiff and Mr. Bartholomew "associated with Schedule I controlled substances" – defendants "had reasonable suspicion that heroin was hidden or otherwise located inside the Chevrolet Malibu." Id. at ¶21. Strickland "radioed for Corporal Kyle Gunter to respond . . . with his K-9 officer, Oli, a narcotics detection dog, to perform a 'canine sniff' of the Chevrolet Malibu." Id. "According to dispatch records, Corporal Gunter radioed at 12:00 p.m. that he and Oli were on their way[.]" Id.

"Shortly thereafter, Franklin County Sheriff's Detective Jonathan Craig arrived at the scene." Id. at ¶22. Barrett advised Strickland he had observed the rubber band on the gear shifter of the Malibu, and Strickland told Barrett he had observed cotton strewn on the floorboard, and both officers knew these items are respectively used for heroin packaging and injection. Id.

While Strickland "was writing a warning citation" for plaintiff's moving violations, Corporal Gunter arrived at the gas station with his K-9 officer, Oli, circa 12:04 p.m., approximately twelve minutes after Strickland and Barrett had first initiated the traffic stop. Id. at ¶23.

Oli "was a fully certified Narcotics K-9" that, "for several years," had "consistently provided accurate alerts to the presence of narcotics" which "were substantiated by the discovery

5

of narcotics where Oli had alerted." Id. at ¶24. Strickland "advised Corporal Gunter regarding what had happened and what he and Corporal Barrett had observed to that point." Id.

When Corporal Gunter removed Oli from his patrol vehicle, "Mr. Bartholomew spontaneously exited the Chevrolet Malibu for a second time and again moved quickly toward the trash can in another apparent attempt to throw something away before he could be caught with it." Id. at ¶25. Strickland "followed Mr. Bartholomew to the trash can and instructed him to stand still while K-9 officer Oli performed a 'canine sniff' of the exterior of the Chevrolet Malibu." Id. Craig and Barrett told plaintiff to exit the vehicle for officer safety during the "canine sniff." Id.

"Corporal Gunter ran K-9 officer Oli around the exterior" of the Chevrolet Malibu and "Oli alerted to the passenger door area of the vehicle near where Mr. Bartholomew had been sitting, indicating that he detected the scent of narcotics in that location." Id. at ¶26.

After Strickland finished writing the warning citation for the moving violations, he handed it to plaintiff, returned plaintiff's driver's license, and told plaintiff that Oli had alerted to the Chevrolet Malibu. Id. at ¶27. Defendants asked both plaintiff and Mr. Bartholomew if they had any illegal substances inside the vehicle, but both denied it. Id. Defendants advised plaintiff that, based on the K-9 officer alert, they had probable cause to search the interior of the vehicle for drugs. Id. "In response, Plaintiff spontaneously told [ ] Strickland that he had hypodermic needles in his pants pocket, which Plaintiff advised he had used to shoot up cocaine." Id. "Plaintiff's behavior seemed to [ ] Strickland to be extremely odd and out of place, as if Plaintiff were attempting to distance himself from even the word or thought of heroin." Id.

Barrett and Corporal Gunter searched the interior of the Chevrolet Malibu, Detective Craig conducted a pat down of plaintiff, and Strickland conducted a pat down of Mr. Bartholomew. Id.

6

at ¶28.    Strickland observed that Mr. Bartholomew continued "to act in a very nervous manner," suggesting to Strickland that Mr. Bartholomew was trying to hide something on his person.    Id.

As a result of the search of the Chevrolet Malibu, Barrett and Corporal Gunter found a "beer can that had been fashioned into a device to use to smoke marijuana, with marijuana residue present on the beer can, along with pieces of cotton and rubber bands," but "they did not find heroin or other narcotics in the vehicle."    Id. at ¶29.    "Nevertheless, based upon K-9 Oli having alerted to the scent of narcotics and Mr. Bartholomew's strange behavior and obvious attempts to get rid of something before it could be found on his person," defendants "had probable cause to believe that Mr. Bartholomew and/or Plaintiff were hiding heroin on their persons in such a way that it could not be detected by the pat-down searches that had previously been conducted."    Id.    "Strickland advised Mr. Bartholomew and Plaintiff that the Deputies wanted to search them more thoroughly inside of the bathroom of the gas station and asked Plaintiff and Mr. Bartholomew for their consent."    Id.    Plaintiff gave verbal consent, but Mr. Bartholomew initially objected.    Id.

In response, Strickland recounted that: Mr. Bartholomew "was acting in a very nervous way, including making repeated attempts to get rid of something into a trashcan"; the K-9 narcotics detection dog alerted to his door area; drug paraphernalia had been found inside the vehicle; and Mr. Bartholomew and plaintiff were "returning from Henderson, a well-known heroin trafficking location."    Id. at ¶30.    Thereafter, "Mr. Bartholomew changed his mind and consented to submit to a more thorough search of his person inside of the gas station bathroom."    Id. at ¶31.

Defendants decided to search Mr. Bartholomew first because the K-9 had alerted to the side of the vehicle where he was sitting, and because he twice had spontaneously exited the vehicle and walked to a trash can "in an apparent attempt to get rid of something."    Id. at ¶32.

7

Defendants walked Mr. Bartholomew into the bathroom to conduct the search outside of public view, "Mr. Bartholomew spontaneously pulled his pants and underwear down to his ankles and squatted without either [defendant] telling him to do anything." Id. at ¶33. This "behavior was extremely strange," and neither defendant "had ever seen anyone act in this manner before." Id. Strickland asked Mr. Bartholomew what he was doing, and he "responded that he did not have anything to hide" and "then pulled his underwear and pants back up and re-fastened them." Id. at ¶34. Strickland then told him "they were going to search Mr. Bartholomew, one article of his clothing at a time." Id. "In response, Mr. Bartholomew once again pulled his pants and underwear down to his ankles and squatted down without being told to do so, again insisting that he did not have anything on him." Id. Mr. Bartholomew "then spontaneously pulled his pants and underwear back up." Id. When Strickland again told him "they were going to search him, one article of his clothing at a time," "Mr. Bartholomew pulled his pants and underwear down to his ankles and squatted down for a third time, again proclaiming that he had nothing to hide." Id.

"Strickland directed Mr. Bartholomew to take his shoes off, and Mr. Bartholomew did so." Id. at ¶35. Barrett "observed numerous bindles of heroin stuffed inside of Mr. Bartholomew's shoes" and advised Strickland to handcuff Mr. Bartholomew. Id. Barrett said he "had seen a large quantity of what appeared to be heroin in Mr. Bartholomew's shoes." Id. Strickland "looked and saw a large number of small white wax paper heroin bags, often called 'bindles,' each one marked with a red 'Champion' stamp on it" that were held together by small tan rubber bands identical to the one Barrett previously had observed on the gearshift of the Chevrolet Malibu. Id.

Based on his training and experience, Strickland knew "the quantity of heroin found in Mr. Bartholomew's shoes far exceeded the amount that a mere user might possess," and that "it was

8

common for subjects to buy more heroin than they intended to use themselves in order to sell the extra bags to support their drug habit." Id. at ¶36.

Strickland advised Mr. Bartholomew of his Miranda rights, and Mr. Bartholomew confirmed both that he understood his rights and that he was waiving them to talk with defendants. Id. at ¶37. Mr. Bartholomew told defendants that plaintiff "had agreed to drive him to Henderson to buy heroin." Id. Mr. Bartholomew "advised that he had given Plaintiff gas money for driving him to Henderson and back and that he had also agreed to give Plaintiff a few of the bindles of heroin at the end of the trip as further payment for driving him to Henderson to buy heroin." Id.

After arresting Mr. Bartholomew, defendants returned him outside and "handed him over to Corporal Gunter and Detective Craig." Id. at ¶38. Defendants then escorted plaintiff to the men's room of the gas station to conduct a search away from public view. Id. "Having found a large quantity of heroin on Mr. Bartholomew," defendants "believed that there was probable cause to believe that Plaintiff also had heroin or other drugs on his person, either drugs that he had bought himself or that Mr. Bartholomew had given to him." Id. Neither defendant touched plaintiff "while conducting the strip search of his person." Id. Instead, defendants "directed the Plaintiff to remove one article of clothing at a time and to manipulate the article of clothing (squeeze, open and close it, etc.) in order to be able to observe whether anything was hidden on or inside of it." Id. Defendants "found the hypodermic needles inside of Plaintiff's pants pocket," as plaintiff had previously reported to Strickland. Id. Although defendants did not find any drugs on plaintiff's person, they "still had probable cause to arrest Plaintiff . . . for possession of heroin (in coordination with Mr. Bartholomew), for keeping and maintaining a vehicle for the use, storage, or sale of a controlled substance, and for possession of drug paraphernalia." Id.

9

"Strickland read Plaintiff his Miranda rights which Plaintiff acknowledged he understood." Id. at ¶39. Plaintiff agreed to waive these rights and talk to defendants. Id. Plaintiff admitted to defendants he "recently relapsed back into using heroin," and confirmed what Mr. Bartholomew had told defendants a few minutes earlier – "that Mr. Bartholomew had given him money for gas to drive Mr. Bartholomew to Henderson to buy heroin, and that Mr. Bartholomew had also agreed to share some of his heroin as further payment for driving him to Henderson." Id.

Plaintiff and Mr. Bartholomew were arrested and taken to appear before the Magistrate where defendants testified truthfully and accurately as to these events. Id. at ¶41. Magistrate J.T. Leonard: "found probable cause existed to charge Mr. Bartholomew with possession with intent to sell and deliver heroin and possession of drug paraphernalia"; "found probable cause existed to charge Plaintiff with possession of heroin, for keeping and maintaining a vehicle for use, storage or sale of a controlled substance, and possession of drug paraphernalia"; and set bond. Id.

"At the Franklin County Sheriff's Office, Detective Craig once again advised both Mr. Bartholomew and Plaintiff of their Miranda rights. Each once again waived their rights, in writing." Id. at ¶42. Mr. Bartholomew wrote a statement admitting: "I went and got 50 bag's from King did 3 bag's and went to the House of Toyz to look at rim's, then when headed back home I was pulled over [sic]." Id. at ¶43. Plaintiff wrote a statement admitting:

> me and my friend came from Nash County to Henderson to buy some heroin I was doin a favor for my friend Chad Barthalemu we came down 39 Hw to Hw 56 got back in my car we come back the same way we came He told me to stop by the store to get cigarettes that's when we got pulled over [sic].

Id at ¶44.

"Plaintiff and Mr. Bartholomew were each fingerprinted and booked in the Franklin County Detention Center." Id. at ¶45.

10

Defendants processed the evidence – including, "forty-seven (47) white wax paper heroin bags/bindles, each with a red 'Champion' stamp on it"; the "beer can made into a smoking device, with marijuana residue on it"; and "tan rubber bands found inside the vehicle" – and "placed it into the secured evidence room at the Franklin County Sheriff's Office." Id. at ¶46. A State Bureau of Investigation crime laboratory analysis confirmed that the bindles were positive for heroin. Id.

The "Chevrolet Malibu vehicle was towed by Ronnie White's Towing to the Franklin County Sheriff's Office impound lot." Id. at ¶47. Thereafter, "as evidence, the status of the vehicle fell into the authority and discretion of the District Attorney's Office." Id.

Plaintiff waived his probable cause hearing. Id at ¶49. Pursuant to this arrest, on March 4, 2019, a Franklin County Grand Jury indicted plaintiff for felony unlawful possession of a Schedule I controlled substance, N.C. Gen. Stat. § 90-95(D)(1), maintaining a vehicle or dwelling for use, storage, or sale of controlled substances, N.C. Gen. Stat. § 90-108(a)(7), and possession of drug paraphernalia, N.C. Gen. Stat. § 90-113.22. Id. at ¶50.

On March 13, 2020, in Franklin County Criminal Superior Court, Mr. Bartholomew was convicted for possession with intent to sell a Schedule I controlled substance (heroin) pursuant to the offense conduct on September 18, 2018. Id. at ¶51.

On September 23, 2019, plaintiff was arrested for the robbery of the First Carolina State Bank in Rocky Mount, North Carolina, which occurred on November 9, 2018. Id. at ¶52.

> Because Plaintiff was already facing extremely serious federal bank robbery charges, the penalty for which far exceeded the likely punishment that he would receive upon conviction of the state law drug charges . . . and because the procedure to pursue a detainer of an individual in federal custody in order to try that person for state criminal offenses is a time-consuming and labor-intensive process, the District Attorney's office in Franklin County made the decision to dismiss the charges pending against Plaintiff in Franklin County Criminal Superior Court, without prejudice . . . . [T]he District Attorney's Office nevertheless believed that

11

ample evidence supported the charges against Plaintiff . . . and they were confident in their ability to convict Plaintiff of these charges. [But they] dismissed the charges against Plaintiff solely to conserve limited prosecutorial resources and the ability to devote those resources toward other cases and criminal defendants.

Id. at ¶53.

Plaintiff subsequently was convicted of the bank robbery charge in the U.S. District Court for the Eastern District of North Carolina and sentenced to 92 months' incarceration. Id. at ¶54.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The moving party initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

The court first considers plaintiff's allegations that both the initial traffic stop and the subsequent dog sniff violated the Fourth Amendment. See Compl. [D.E. 1] at 9–10.

12

The Fourth Amendment, in relevant part, protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." Heien v. North Carolina, 574 U.S. 54, 60 (2014) (citations omitted).

Under the two-prong approach of Terry v. Ohio, 392 U.S. 1 (1968), a Fourth Amendment reasonableness inquiry for a traffic stop "asks (1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the stop," United States v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018) (internal citations and internally quotation marks omitted).

Generally, a traffic stop is reasonable where an officer has "probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996) (citation omitted). A traffic stop, however, "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a citation or written warning. Illinois v. Caballes, 543 U.S. 405, 407 (2005). Aside from deciding whether to issue a traffic ticket, an officer's mission entails "ordinary inquiries incident to" the traffic stop, which typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015) (citations omitted). A traffic stop becomes unlawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 354; see United States v. Hill, 849 F.3d 195, 200 (4th Cir. 2017) ("A routine traffic stop becomes an unreasonable seizure when law enforcement impermissibly exceeds the stop's scope or duration.")

13

United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." (citation omitted)).

Notably, "a dog sniff is not fairly characterized as part of the officer's traffic mission," but instead "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Rodriguez, 575 U.S. at 355–56. Thus, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop to conduct a dog sniff. Id. at 355–58; United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015); see United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017) (noting a dog-sniff "may not prolong the duration of the traffic stop absent consent of those detained or reasonable suspicion of criminal activity").

Here, Strickland avers, inter alia: while serving as a Franklin County Deputy Sheriff, Strickland "conducted more than one thousand (1000) traffic stops"; to Strickland's knowledge, "at no time . . . were any traffic stops [he] initiated determined to be without legal basis or otherwise dismissed as being unfounded"; while patrolling Franklin County Roads as a Deputy Sheriff in a marked patrol vehicle shortly before noon on September 18, 2018, Strickland saw a white four-door 2005 Chevrolet Malibu on Bickett Boulevard, in Louisburg, driving erratically, shifting lanes without using a turn signal, failing to maintain lane control, and drifting into the center turn lane; having observed these moving violations, Strickland initiated a traffic stop on the vehicle at 11:52 a.m.; after plaintiff pulled over, Strickland ran the license plate and learned it was registered to an elderly female residing in Nash County but noted it was occupied by two young white males; Strickland approached the vehicle and told plaintiff why Strickland had stopped him, "explaining the numerous traffic violations" Strickland "had just observed him commit"; while conversing

14

with plaintiff, Strickland observed "track marks" in the crease/crook of plaintiff's elbow and saw small pieces of cotton lying on the driver's side floorboard; plaintiff told Strickland he was returning from Henderson; based on Strickland's training and experience, the "track marks" were indicative of intravenous drug use, such small cotton pieces are "used as a filter to prepare heroin for injection," and Henderson is "a popular place for the purchase and sale of heroin"; Strickland took driver's licenses from plaintiff and his passenger, Mr. Bartholomew; when he processed the names and driver's license numbers in his patrol vehicle computer, Strickland learned both plaintiff and Mr. Bartholomew had prior arrests associated with possession or sale of heroin with intent to distribute; Strickland observed plaintiff and Mr. Bartholomew exhibited "odd and extremely nervous behavior" including when, during the stop, Mr. Bartholomew left the vehicle and walk toward a trash can seemingly attempting to throw away something; based on the totality of the circumstances, Strickland believed there was a "strong chance that heroin was located within the vehicle" and radioed for Corporal Gunter to respond and perform a "canine sniff"; Barrett told Strickland he believed Mr. Bartholomew was under the influence of narcotics and observed a small tan rubber band on the vehicle's gear shifter and, based on his training and experience, Strickland "knew that this type of small tan rubber band was commonly used to package heroin"; when Corporal Gunter removed K-9 Oli from his patrol vehicle, Mr. Bartholomew "spontaneously" left the Chevrolet Malibu and "approached the trash can for a second time, in another apparent attempt to throw something away before he could be caught with it"; during the "canine sniff," Oli alerted to the passenger door area of the Malibu; Strickland completed writing the warning citation, gave plaintiff the warning citation and returned his driver's license, and told plaintiff that K-9 Oli had alerted to the vehicle.   See Defs.' App., Ex. 1, Strickland Aff. [D.E. 39-1] at ¶¶1–3, 5–19.

15

Barrett avers, *inter alia*: while serving as a Franklin County Deputy Sheriff, Barrett "conducted more than twelve hundred (1200) traffic stops"; to Barrett's knowledge, "none of the traffic stops that [he has] initiated during [his] career as a law enforcement officer have been determined to be without adequate legal basis"; on September 18, 2018, Barrett was riding with Strickland in a marked patrol vehicle; shortly before noon, the deputies "were driving south on North Carolina Highway 39/U.S. Highway 401, otherwise known as Bickett Boulevard"; "At that point, Bickett Boulevard consists of two lanes running in each direction, with a turn lane running down the middle of it"; the officers were following behind a white four-door 2005 Chevrolet Malibu that was driving erratically; Barrett observed the vehicle failing to maintain lane position and drifting between lanes without using a turn signal; defendants "commented to one another about how the Chevrolet Malibu was driving erratically and our belief that the way that it was operating presented a threat to other motorists on the road"; Strickland and Barrett "agreed that [they] should initiate a traffic stop of the white Chevrolet to investigate and address the multiple and ongoing moving violations"; after the stop, Barrett observed the vehicle was driven by a white male and another white male sat in the passenger seat; Barrett approached the passenger door, and Mr. Bartholomew "seemed very nervous and scared"; Barrett observed fresh wounds on Mr. Bartholomew's arm that, based upon his training and experience, were consistent with intravenous drug use and "helped explain" why Mr. Bartholomew "was acting in a manner consistent with someone who was under the influence of narcotics"; inside the car, Barrett saw a small rubber band placed around the gearshift lever which, based upon his training and experience, is "commonly used to package dosages of heroin in small plastic baggies, sometimes referred to as 'bindles'"; Strickland checked the driver's licenses and told Barrett that both men had previous

16

heroin-related arrests; Barrett told Strickland "that Mr. Bartholomew was acting strangely and consistent with being under the influence of narcotics"; Strickland told Barrett that plaintiff provided a suspicious cover story about why they had gone to Henderson, which "is a well-known location for heroin trafficking"; Mr. Bartholomew left the vehicle and walked toward a trash can in an apparent attempt to throw away something but Strickland intervened and Mr. Bartholomew returned to the vehicle; the officers had reasonable suspicion that plaintiff or Mr. Bartholomew "were in possession of heroin or some other illegal substances"; Strickland radioed Corporal Gunter who arrived at the gas station circa 12:04 p.m.; After detective Craig arrived, Strickland and Barrett discussed the rubber band on the gearshift and the cotton pieces on the driver's floorboard; when Corporal Gunter removed K-9 officer Oli from his patrol vehicle, Mr. Bartholomew again left the vehicle and "walked quickly toward the trash can in another apparent attempt to get rid of something before it was found on him," and Strickland again intervened; Barrett directed plaintiff to exit the vehicle during the "canine sniff"; and K-9 officer Oli alerted to the passenger door area.    Id., Ex. 2, Barrett Aff., [D.E. 39-2] at ¶¶1–3, 5–17.

The record evidence supports defendants' averments.    Id., Ex. 1C, [D.E. 39-1] at 23–28 (Sept. 18, 2018, Franklin Cnty. Sheriff's Office incident/investigation report regarding the traffic stop and drug-dog sniff).

Plaintiff, by contrast, has not offered affidavits or declarations in opposition to defendants' motion for summary judgment despite receiving adequate notice under Roseboro, 528 F.2d at 310, and having an opportunity to do so, see Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021).    Instead, plaintiff merely relies upon the allegations in his unverified complaint.    Cf. Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021); see Fed. R. Civ. P. 56(e).

17

Further, the court's prior order deemed that plaintiff has admitted, *inter alia*: he was driving a white 2005 Chevrolet Malibu automobile on Bickett Boulevard in Louisburg on September 18, 2018; he committed multiple moving violations when he changed lanes without using a turn signal, drifted into the oncoming lane of traffic, and failed to maintain lane control; Strickland initiated a lawful and reasonable traffic stop; plaintiff had fresh injection or "track" marks on his arm; there were small cotton pieces scattered on the driver's floorboard and a rubber band on the gearshift lever of the vehicle he was driving; as of September 18, 2018, plaintiff had at least one prior conviction for possession, with intent to sell, a Schedule I controlled substance, and Mr. Bartholomew had multiple prior convictions for both possession of, and possession, with intent to sell, a Schedule I controlled substance; and a K-9 officer/drug dog alerted to the scent of illegal drugs in the vehicle plaintiff was driving. See RFA [D.E. 26-1] at ¶¶1–20, 40; Order [D.E. 35]; see also Fed. R. Civ. P. 36; Adventis, Inc. v. Consol. Prop. Holdings, Inc., 124 F. App'x 169, 173 (4th Cir. 2005) (unpublished) ("Rule 36 admissions are conclusive for purposes of the litigation and are sufficient to support summary judgment." (citation and alteration omitted)).

Considering the uncontroverted statement of facts, plaintiff's admissions, and defendants' averments, plaintiff fails to demonstrate that defendants lacked a reasonable suspicion to initiate a traffic stop or that their actions – checking the vehicle's tags, speaking with the detainees to determine their identities, verifying their driver's licenses, writing a citation, and briefly extending the stop for a "canine sniff" after developing a reasonable, articulable suspicion as to the presence of narcotics in the vehicle – were outside the ordinary, lawful tasks incident to a traffic stop. See Whren, 517 U.S. at 810; Caballes, 543 U.S. at 407; Bowman, 884 F.3d at 209; Hill, 852 F.3d at 382; Branch, 537 F.3d at 335; cf. Rodriguez, 575 U.S. at 350–51; Williams, 808 F.3d at 245–53.

18

Plaintiff's bald allegations contesting the constitutionality of the traffic stop and dog sniff are insufficient to defeat defendants' motion for summary judgment. See Fed. R. Civ. P. 56(e); Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) ("conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion"); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) ("neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

Next, the court considers plaintiff's claim that defendants' warrantless searches violated the Fourth Amendment. See Compl. [D.E. 1] at 11–12.

As an initial matter, "when the officer has a reasonable suspicion that illegal drugs are in the vehicle," he may "order the occupants out of the vehicle and pat them down briefly for weapons." United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998).

Although "warrants are generally required to search a person's home or his person," Mincey v. Arizona, 437 U.S. 385, 393–94 (1978), automobile searches are an exception to this requirement, see Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more" (citation omitted)); United States v. Kelly, 592 F.3d 586, 589–90 (4th Cir. 2010) ("The scope of a search pursuant to [the automobile] exception is as broad as a magistrate could authorize. Thus, once police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" (internal citation omitted)).

Probable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, "viewed through the lens of common sense, would make a reasonably

19

prudent person think that a search would reveal contraband or evidence of a crime." United States v. Green, 740 F.3d 275, 282 (4th Cir. 2014) (quoting Florida v. Harris, 568 U.S. 237, 243 (2013)).

The Harris Court found that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," and based on this evidence, "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Harris, 568 U.S. at 246–47. The Court further found: "The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." Id. at 247.

To be constitutional, however, a search must not be unreasonable. Johnson v. Robinette, 105 F.4th 99, 113 (4th Cir. 2024). Where the "search involves 'movement of clothing to facilitate the visual inspection of a [person's] naked body,' the search qualifies as a type of 'sexually invasive search.'" Sims v. Labowitz, 885 F.3d 254, 261 (4th Cir. 2018) (quoting United States v. Edwards, 666 F.3d 877, 882–83 (4th Cir. 2011)). To determine the reasonableness of a sexually invasive search, courts "consider the following factors: (1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed." Id. (citation omitted).

Here, Strickland avers, *inter alia*: "Oli was a fully certified Narcotics K-9 that had served with our Office for several years and had consistently provided accurate alerts to the presence of narcotics, alerts that were substantiated by the detention of narcotics"; Strickland asked plaintiff and Mr. Bartholomew if they had anything illegal inside the vehicle, and both responded, "no"; Strickland advised plaintiff that, based on the K-9 alert, officers had probable cause to search the interior of the vehicle for drugs and would do so; in response, plaintiff "spontaneously told

20

[Strickland] that he had hypodermic needles inside of his pocket, which he had used to shoot up cocaine," which Strickland found "extremely odd and out of place"; while Barrett and Corporal Gunter searched the interior of the vehicle, Strickland and Detective Craig conducted pat downs of Mr. Bartholomew and plaintiff, respectively; Mr. Bartholomew "continued to act in a very nervous manner," suggesting to Strickland "that he was trying to hide something on his person"; Barrett and Corporal Gunter found a beer can fashioned into a device to smoke marijuana with marijuana residue on it, but did not find heroin or other narcotics in the vehicle; based on the K-9 alert and Mr. Bartholomew's strange behavior, "it was highly likely that Mr. Bartholomew and/or [plaintiff] were secreting heroin on their persons in such a way that it could not be detected by the regular exterior pat-down searches that we had conducted"; Strickland advised Mr. Bartholomew and plaintiff that the officers wanted to search them more thoroughly inside the gas station bathroom, and plaintiff "said, 'OK' and otherwise gave his consent"; when Mr. Bartholomew "stated that searching him was against his rights," Strickland "advised Mr. Bartholomew" that K-9 officer Oli "had alerted on his side of the vehicle," that Mr. Bartholomew "was acting in a very nervous way, and that heroin paraphernalia – pieces of cotton and the rubber band – were clearly visible inside the vehicle he was riding," and the officers "knew he had prior arrests associated with heroin"; after Strickland "explained these circumstances to Mr. Bartholomew, he agreed to submit to a more thorough search of his person inside the gas station bathroom"; in the bathroom, Mr. Bartholomew, unprompted, pulled down his pants and underwear and squatted; Strickland had never seen any act like this before; Strickland asked Mr. Bartholomew what he was doing and he stated he had nothing to hide; Strickland twice told Mr. Bartholomew the officers were going to search one article of his clothing at a time and Mr. Bartholomew twice more pulled his pants and

21

underwear down to his ankles and squatted without being told to do so; Strickland instructed Mr. Bartholomew to take off his shoe, which he did; as Strickland searched Mr. Bartholomew's pockets, Barrett advised Strickland to handcuff Mr. Bartholomew which Strickland did; Barrett stated he had observed a large quantity of heroin in Mr. Bartholomew's shoes; Strickland saw numerous small white wax paper heroin "bindles," each marked with a red "Champion" stamp and held together by small tan rubber bands identical to the ones Barrett had observed on the vehicle gearshift; based on his training and experience, Strickland believed the heroin quantity was too great for a mere user and suspected Mr. Bartholomew was selling the extra bags to support a drug habit; Strickland advised Mr. Bartholomew of his <u>Miranda</u> rights which he confirmed he understood, waived, and agreed to talk with defendants; Mr. Bartholomew told defendants plaintiff had driven him to Henderson in order for him to purchase heroin, that he gave plaintiff gas money, and he was going to give plaintiff "a few of the bindles of heroin at the end of the trip as further payment for driving him to Henderson to buy heroin"; defendants escorted Mr. Bartholomew outside and escorted plaintiff into the gas station bathroom "to conduct a more thorough search of his person for drugs and other contraband"; defendants searched plaintiff without physically touching him, directing him to remove one item of his clothing at a time; defendants located the hypodermic needles plaintiff previously told Strickland about but did not find any heroin or other drugs on plaintiff.  <u>See</u> Defs.' App., Ex. 1, Strickland Aff. [D.E. 39-1] at ¶¶16, 19–25.

Barrett avers, *inter alia*: under the totality of the circumstances, defendants "believed that the narcotics that Oli had alerted on were likely on the person" and had probable cause to search plaintiff and Mr. Bartholomew because "we did not find any drugs in the Chevrolet Malibu," "Mr. Bartholomew had twice spontaneously exited the vehicle in an apparent attempt to get rid of

22

something," and plaintiff "had said that he had hypodermic needles in his pocket"; defendants asked both plaintiff and Mr. Bartholomew for consent to search them and plaintiff consented while Mr. Bartholomew initially declined; after Strickland "explained . . . all of the reasons supporting probable cause to believe that he had illicit drugs on his person," "Mr. Bartholomew changed his mind and consented to a search of his person"; defendants "elected to search Mr. Bartholomew first because, among other reasons, Oli had alerted to the side of the vehicle where he had been sitting, and because he had twice spontaneously exited the Chevrolet Malibu and walked to a trash can in an apparent attempt to get rid of something"; in the bathroom, Mr. Bartholomew took off his pants and underwear and squatted without any prompting and exclaimed, "I don't have anything!"; Barrett had never seen anyone do this but it seemed clear to Barrett that Mr. Bartholomew was attempting to prevent a thorough and methodical search of his clothing and person; when Strickland told Mr. Bartholomew to take of his shoes, Barrett "observed numerous bindles (small baggies) of heroin stuffed inside of them" and told Strickland that Mr. Bartholomew needed to be handcuffed; Strickland informed Mr. Bartholomew of his Miranda rights, which he waived; Mr. Bartholomew told defendants he asked plaintiff to drive him to Henderson so Mr. Bartholomew could buy some heroin and, in exchange, Mr. Bartholomew "had agreed to give [plaintiff] some gas money and also to share some of the heroin with him"; after arresting Mr. Bartholomew, defendants escorted him back outside and escorted plaintiff into the gas station bathroom to conduct the search outside of public view; "While we had found a large quantity of heroin on Mr. Bartholomew, we had probable cause to believe that [plaintiff] might also have heroin on his person, either heroin that he had bought himself or that Mr. Bartholomew had given to him"; plaintiff was not physically touched during the strip search which entailed removing his

23

articles of clothing, manipulating the clothing items to determine whether anything was hidden therein, and doing a visual body search; and, although defendants "did not find any drugs or illegal substances on plaintiff during the search," they "did find hypodermic syringes in his pants pocket that he had told [ ] Strickland he had." Id., Ex. 2, Barrett Aff., [D.E. 39-2] at ¶¶19–23.

The record evidence supports defendants' averments. See id., Ex. 1C, [D.E. 39-1] at 23–28 (Sept. 18, 2018, Franklin Cnty. Sheriff's Office incident/investigation report as to the searches).

The court's prior order also deemed that plaintiff has admitted, *inter alia*: he had fresh injection or "track" marks on his arm; in the vehicle he was driving, there were small cotton pieces scattered on the driver's floorboard and a rubber band on the gearshift; as of September 18, 2018, he had at least one prior conviction for possession, with intent to sell, a Schedule I controlled substance, and Mr. Bartholomew had prior convictions for possession of, and possession, with intent to sell, a Schedule I controlled substance; a K-9 officer/drug dog alerted to the scent of illegal drugs in the vehicle he was driving; and that plaintiff told Strickland, without being asked, he had hypodermic needles in his pocket. See RFA [D.E. 26-1] at ¶¶13–20; Order [D.E. 35].

Considering the uncontroverted statement of facts, plaintiff's admissions, and defendants' averments, plaintiff fails to show that defendants' warrantless searches of the vehicle and his person violated the Fourth Amendment. See Harris, 568 U.S. at 247; Labron, 518 U.S. at 940; Johnson, 105 F.4th at 113; Green, 740 F.3d at 282; Kelly, 592 F.3d at 590; Sakyi, 160 F.3d at 169; see also United States v. Han, 74 F.3d 537, 541 (4th Cir. 1996) ("A search may be incident to a subsequent arrest if the officers have probable cause to arrest before the search." (citing Rawlings v. Kentucky, 448 U.S. 98, 111 (1980))); United States v. Madriz, 532 F. App'x 353, 355 (4th Cir. 2013) (per curiam) (unpublished); cf. Sims, 885 F.3d at 261–62; Edwards, 666 F.3d at 883–85.

24

Plaintiff's contrary allegations as to the constitutionality of these searches, without more, are insufficient to defeat defendants' motion for summary judgment.  See Fed. R. Civ. P. 56(e); Wai Man Tom, 980 F.3d at 1037; Bouchat, 346 F.3d at 522.

The court now considers plaintiff's allegations that his arrest and prosecution violated the Fourth Amendment.  See Compl. [D.E. 1] at 13–14.

To establish a § 1983 false arrest claim, plaintiff must show that his warrantless arrest was without probable cause.  English v. Clarke, 90 F.4th 636, 646 (4th Cir. 2024); Smith v. Munday, 848 F.3d 248, 257 (4th Cir. 2017).  "Probable cause to justify an arrest arises when 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998) (citation omitted); see also Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

"A malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort."  Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (citation and internal quotation marks omitted).  To prevail on this claim, plaintiff must show that defendants "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor."  Humbert v. Mayor & City Council of Balt. City, 866 F.3d 546, 555 (4th Cir. 2017) (quoting Evans, 703 F.3d at 647); see also Thompson v. Clark, 596 U.S. 36, 39, 49 (2022) (elucidating the § 1983 favorable termination requirement).

25

Here, Strickland avers, *inter alia*: he has been involved in hundreds of drug arrests and, to his knowledge, "at no time . . . were any of the drug arrests in which [he] was involved determined to be without probable cause or otherwise dismissed as being unfounded"; after locating hypodermic needles on plaintiff, Strickland read plaintiff his <u>Miranda</u> rights which he confirmed he understood, waived, and agreed to talk with defendants; plaintiff admitted "he had recently relapsed back into using heroin" and "stated that Mr. Bartholomew had given him some money for gas to drive Mr. Bartholomew to Henderson to buy heroin, and that Mr. Bartholomew had also agreed to give him some heroin as further payment for driving him to Henderson"; plaintiff and Mr. Bartholomew were arrested and taken to appear before the Magistrate; defendants testified truthfully and accurately recounted what had happened and what they had observed; Magistrate J.T. Leonard "found probable cause to charge Mr. Bartholomew with possession with intent to sell and deliver heroin and possession of drug paraphernalia" and "found probable cause existed to charge [plaintiff] with possession of heroin and for keeping and maintaining a vehicle for use, storage or sale of a controlled substance, and possession of drug paraphernalia"; Detective Craig once again advised both Mr. Bartholomew and plaintiff of their <u>Miranda</u> rights, which both waived in writing; in a sworn statement, Mr. Bartholomew wrote, "I went and got 50 bag's from King did 3 bag's and went to the House of Toyz to look at rim's, then when headed back home I was pulled over [sic]"; in a sworn statement, plaintiff wrote, "me and my friend came from Nash County to Henderson to buy some heroin I was doin a favor for my friend Chad Barthalemu [sic] . . . . He told me to stop by the store to get cigarettes that's when we got pulled over [sic]"; defendants processed the evidence which consisted of "forty-seven (47) white wax paper heroin bags/bindles, each with a red 'Champion' stamp on it," a "beer can made into a smoking device, with marijuana

26

residue on it"; and "tan rubber bands found inside the vehicle"; this evidence was placed in the secured evidence room at the Franklin County Sheriff's Office; the "bags of suspected heroin were sent to the SBI crime laboratory for analysis, which confirmed that it was positive for heroin"; and at all times associated with plaintiff and Mr. Bartholomew, Strickland "acted in good faith and pursuant to lawful motives, performing [his] law enforcement duties properly and to the best of [his] abilities." See Defs.' App., Ex. 1, Strickland Aff. [D.E. 39-1] at ¶¶4, 25–34.

Barrett avers, *inter alia*: defendants had probable cause to arrest plaintiff "for possession of heroin (in conjunction with Mr. Bartholomew), for keeping and maintaining a vehicle for the use, storage, or sale of a controlled substance, and for possession of drug paraphernalia"; Strickland read plaintiff his Miranda rights which he confirmed he understood, waived, and agreed to talk with defendants; plaintiff told defendants "Mr. Bartholomew had given [plaintiff] some gas money to drive him to Henderson to buy heroin there and that Mr. Bartholomew had also agreed to share with [plaintiff] some of the heroin he had bought but had not yet done so before [defendants] had stopped them"; Barrett and Strickland both testified truthfully before the Magistrate who found probable cause to charge Mr. Bartholomew with possession with intent to sell and deliver heroin and possession of drug paraphernalia, and to charge plaintiff with possession of heroin and for keeping and maintaining a vehicle for use, storage or sale of a controlled substance, and possession of drug paraphernalia; at the Sheriff's Office, Detective Craig advised both plaintiff and Mr. Bartholomew of their Miranda rights which they both waived and provided written statements, and both were fingerprinted and booked; "The Chevrolet Malibu vehicle was towed by Ronnie White's Towing to the Franklin County Sheriff's Office impound lot. From that point forward . . . the vehicle fell under the authority and discretion of the District

27

Attorney's Office as evidence"; and at all times associated with plaintiff and Mr. Bartholomew, Barrett "acted in good faith and pursuant to lawful motives, performing [his] law enforcement duties properly and to the best of [his] abilities." Id., Ex. 2, Barrett Aff., [D.E. 39-2] at ¶¶23–31.

The record evidence supports defendants' averments. See id., Ex. 1A, [D.E. 39-1] at 16–18 (Mr. Bartholomew's signed Miranda waiver and written statement); id., Ex. 1B, [D.E. 39-1] at 19–22 (plaintiff's signed Miranda waiver and written statement); id., Ex. 1C, [D.E. 39-1] at 23–28 (Sept. 18, 2018, Franklin Cnty. Sheriff's Office incident/investigation report as to plaintiff's and Mr. Bartholomew's arrest, criminal charges, and their written Miranda waivers and statements).

Additionally, North Carolina 11th Prosecutorial District Assistant District Attorney Allison S. Capps avers, *inter alia*: Capps is a supervisor in Franklin County; in 18 CRS 52114, plaintiff was charged with unlawful possession of a Schedule I controlled substance and maintaining a vehicle or dwelling for use, storage, or sale of controlled substances; in 18 CRS 52115, plaintiff was charged with possession of drug paraphernalia; plaintiff waived his probable cause hearing; a Franklin County Grand Jury returned true bills of indictment; when the cases came up for review, plaintiff was in federal custody on bank robbery charges; the procedure to pursue a detainer to try an individual in federal custody on state charges "is often a time-consuming and labor-intensive process"; the District Attorney's Office made the decision to dismiss plaintiff's state drug charges pending in Franklin County Criminal Superior Court without prejudice "in order to conserve and better utilize [ ] limited resources"; on February 4, 2020, Capps completed the form dismissing the charges and listed, as the reason, "other," "Δ [defendant] is in federal custody. Interest of justice"; there was "ample evidence supporting the charges against plaintiff" in Franklin County Criminal Superior Court; Capps "was confident in" the District Attorney's Office's "ability to

28

convict [plaintiff] of all the charges against him"; and "these charges were dismissed solely to conserve our limited prosecutorial resources and our ability to devote these resources toward other cases and criminal defendants." See id., Ex. 3, Capps Aff. [D.E. 39-3].

The record also supports Capps' averments. See id., Ex. 3A, [D.E. 39-3] at 5–6 (dismissal of plaintiff's charges regarding Sept. 18, 2018, offense conduct); id., Ex. 4, [D.E. 39-4] at 1–12 (Mr. Bartholomew's judgment and commitment, transcript of plea, sentencing worksheet, and indictment regarding Sept. 18, 2018, offense conduct); id., Ex. 5, [D.E. 39-5] at 1–7 (Magistrate order, indictment, and dismissal of plaintiff's charges regarding Sept. 18, 2018, offense conduct).

The court's prior order deemed that plaintiff has admitted, *inter alia*: on September 18, 2018, he drove a 2005 Chevrolet Malibu automobile he did not own to Henderson, North Carolina; the purpose of this trip was for his passenger, Mr. Bartholomew, to buy heroin; Mr. Bartholomew bought 50 bags/bindles of heroin in Henderson that day; during the return trip, Mr. Bartholomew ingested 3 bindles; plaintiff told Strickland, without being asked, he had hypodermic needles in his pocket; defendants' search revealed 47 bindles of heroin hidden in Mr. Bartholomew's shoe; Mr. Bartholomew waived his Miranda rights, admitted plaintiff drove to Henderson for Mr. Bartholomew to purchase heroin, he gave plaintiff gas money, and he was going to give plaintiff a few of his bags/bindles of heroin at the end of the trip as compensation, and later waived his Miranda rights in writing and wrote a statement admitting getting "50 bags" and doing "3 bags"; plaintiff was advised of his Miranda rights, which he waived and agreed to speak to officers and admitted that Mr. Bartholomew gave him gas money and was going to give him heroin as payment for driving to Henderson; plaintiff later waived his Miranda rights in writing and wrote a statement admitting he and Mr. Bartholomew came from Nash County to Henderson to buy heroin as a favor

29

for Mr. Bartholomew; Magistrate Leonard found probable cause existed to charge plaintiff with violations of N.C. Gen. Stat. § 90-95(D)(1) (unlawful possession of a Schedule I controlled substance), N.C. Gen. Stat. § 90-108(a)(7) (maintaining a vehicle or dwelling for use, storage, or sale of controlled substances), and N.C. Gen. Stat. § 90-113.22 (possession of drug paraphernalia); he waived a probable cause hearing and was released from the Franklin County Detention Center on October 2, 2018, after posting bond; on March 4, 2019, a Franklin County Grand Jury indicted him for felony unlawful possession of a Schedule I controlled substance, maintaining a vehicle for use, storage or sale of controlled substances, and possession of drug paraphernalia for offenses committed on September 18, 2018; on September 23, 2019, he was arrested for the robbery of the First Carolina State Bank in Rocky Mount, North Carolina that occurred on November 9, 2018; he subsequently was convicted for this bank robbery in the U.S. District Court for the Eastern District of North Carolina, and sentenced to 92 months' incarceration; Mr. Bartholomew was convicted in Franklin County Superior Court of the offense of Possession With Intent to Sell a Schedule I controlled substance (Heroin), which he committed with plaintiff on September 18, 2018; plaintiff's September 18, 2018, arrest was supported by probable cause; and defendants did not violate plaintiff's constitutional rights.   See RFA [D.E. 26-1] at ¶¶1–8, 21–42; Order [D.E. 35].

Considering plaintiff's admissions, defendants' averments, and the uncontroverted statement of facts, plaintiff fails to demonstrate either that his arrest lacked probable cause, see English, 90 F.4th at 646; Smith, 848 F.3d at 257; Porterfield, 156 F.3d at 569, Street v. Surdyka, 492 F.2d 368, 372–73 (4th Cir. 1974), or that he was seized pursuant to legal process unsupported by probable cause, see Humbert, 866 F.3d at 555; Evans, 703 F.3d at 647; see also Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975) (noting, "an indictment, 'fair upon its face,' returned by a

30

'properly constituted grand jury,' conclusively determines the existence of probable cause." (citation omitted)); id. at 124 n.25 (providing, after a warrantless arrest, the Fourth Amendment requires a magistrate to determine probable cause promptly if the person is to be detained or his liberty otherwise restricted).

Plaintiff's contrary allegations regarding the constitutionality of his arrest and prosecution, without more, again are insufficient to defeat defendants' motion for summary judgment. See Fed. R. Civ. P. 56(e); Wai Man Tom, 980 F.3d at 1037; Bouchat, 346 F.3d at 522.

In sum, after viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of a genuine issue of material fact as to plaintiff's Fourth Amendment claims, Celotex, 477 U.S. at 325, but plaintiff merely relies upon the allegations in his unverified complaint, Anderson, 477 U.S. at 248, and fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, defendants are entitled to summary judgment on these Fourth Amendment claims. Anderson, 477 U.S. at 249.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly

31

established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Because reasonable officials in defendants' position would not have recognized that their actions violated plaintiff's clearly established rights, defendants also are entitled to a finding of qualified immunity. See id. at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); Johnson, 105 F.4th at 120–23 (finding officer entitled to qualified immunity where prison inmate was strip-searched weekly in search for contraband and two searches involved momentary touching of plaintiff's genitals); cf. Sims, 885 F.3d at 262–65 (denying qualified immunity in a § 1983 suit alleging Fourth Amendment violations where a detective attempted to obtain a photograph of a juvenile suspect's erect penis and ordered him to masturbate in the presence of others); see also Sowers v. City of Charlotte, 659 F. App'x 738, 740 (4th Cir. 2016) (per curiam) (unpublished) ("In analyzing whether law enforcement officers have qualified immunity in a false arrest claim pursuant to § 1983, the issue is not whether probable cause actually exists but whether a reasonable officer in the officer's position would have believed he had probable cause to arrest." (citing Porterfield, 156 F.3d at 569)); id. at 741 ("A magistrate's probable cause determination indicates a reasonable officer would believe he or she had probable cause to arrest." (citations omitted)).

Finally, because defendants are entitled to summary judgment and dismissal of all federal claims, after considering issues of judicial economy, convenience, fairness, and comity, see Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995), the court declines to exercise supplemental jurisdiction over any lingering state-law claims, see 28 U.S.C. § 1367(c)(3) (granting district courts

discretion to decline to exercise supplemental jurisdiction over a pendent state-law claim where the court has dismissed all claims over which it has original jurisdiction); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (noting "pendent jurisdiction is a doctrine of jurisdictional discretion" and that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (holding district court has "inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"); see also Gantt v. Whitaker, 203 F. Supp. 2d 503, 512 (M.D.N.C. 2002) (declining to exercise supplemental jurisdiction over plaintiff's state law claims including those against the sheriff's official bond), aff'd, 57 F. App'x 141 (4th Cir. 2003); McGill v. McVicker, No. 5:16-CT-3031-FL, 2018 WL 4621900, at *4 (E.D.N.C. Sept. 26, 2018).

Conclusion

For the above reasons, the court: GRANTS defendants' motion for summary judgment [D.E. 36]; DISMISSES plaintiff's federal claims; and DISMISSES WITHOUT PREJUDICE plaintiff's state-law claims. The clerk shall close the case.

SO ORDERED this 24th day of July, 2024.

RICHARD E. MYERS II
Chief United States District Judge

33